**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DYNEGY MARKETING AND TRADE, a Colorado Partnership | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 02 C 7446 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| MULTIUT CORPORATION, an Illinois Corporation, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a dispute over payments for natural gas. Dynegy Marketing and Trade ("Dynegy") alleges that Multiut Corporation ("Multiut") failed to pay for natural gas delivered in 2000, 2001, and 2002. Count I is a claim for breach of the parties 1994 sales agreement and seeks $15,348,244.72 plus interest from Multiut. Count II seeks the same amount from Multiut and also from defendant Nachshon Draiman, the sole owner of Multiut, under a guaranty agreement. Dynegy now moves for summary judgment on these two counts.[1] It also moves for summary judgment on Multiut's six counterclaims. These counterclaims, as well as several related affirmative defenses, allege generally that Dynegy's invoices were inflated because they

---

[1]Dynegy has also filed several fraudulent transfer counts alleging that Draiman caused Multiut to transfer over $21 million to himself, his family, and related business entities and that most of this money came from the sale of gas delivered by Dynegy. But the present summary judgement motion does not address these counts.

either failed to give Multiut price breaks allegedly agreed to in oral agreements or because they were based on an index price that Dynegy had manipulated by reporting false trades.

## FACTS

Multiut is an Illinois corporation with its principal place of business in Skokie, Illinois. Nachshon Draiman is the CEO and controlling shareholder. Dynegy is a Colorado general partnership with its principal place of business in Houston, Texas. Dynegy was formerly known as Natural Gas Clearinghouse or NGC.

In October 1995, Dynegy (then called NGC) and Multiut entered into the Natural Gas Sales Agreement. However, the agreement was dated January 1, 1994, and we will refer to it as the "1994 Agreement." The parties entered into a similar agreement in 1988.

The 1994 agreement set forth the general terms and procedures that would govern the parties' relationship. The agreement anticipated that Multiut would periodically nominate (*i.e.* make a request for) certain amounts of natural gas, expressed in the industry as a "therm." Under the agreement, Multiut was obligated to pay for all quantities nominated and tendered for delivery.

The 1994 agreement was a general agreement in the sense that it did not set forth a single price or quantity to govern the specific nomination requests made throughout the parties' relationship. Instead, the parties contemplated that they would agree to price and quantity terms as well as delivery dates in individual agreements during the course of their relationship. The 1994 Agreement included a form, Exhibit B, on which these agreements would be memorialized.

In nominating gas under the 1994 agreement, Multiut was acting as a middle man. It would purchase and secure gas as a whole from Dynegy and would then allocate it to individual

customers pursuant to agreements negotiated by Multiut with no input from Dynegy.  In fact, Dynegy was not aware of the identity of these customers. Multiut used different pricing methods for different customers. The options included shared savings, an index plus price, a fixed contract price, or a cost plus price.  (Draiman Aff. ¶ 13.)  "Index plus" meant that the customer would pay the published index price plus an agreed-upon additional fixed charge.  The "cost plus" option meant that Multiut's customers paid the same amount for the natural gas that Multiut paid to Dynegy plus an agreed-upon additional fixed charge. As Draiman explained in his deposition, the pricing was a "dynamic procedure which involved a number of people with various different pricing methods and purchasing methods."  (D Ex. 2 at 31-32.)[2]

This lawsuit focuses on the period from 2001 to 2004.  During that time Multiut nominated various amounts of natural gas, at prices agreed to by the parties at the time of nomination, and Dynegy delivered those amounts.  In some cases, the specific agreements as to price and delivery were set forth on the form known as Exhibit B.  In all cases, Dynegy also sent out a monthly invoice showing the total gas nominated and delivered to Multiut for the month.

It is undisputed that, within weeks of receiving these invoices, Joan Shultz at Multiut reviewed them to "make sure they were accurate." Schultz was Multiut's managing Director of Operations from 2001 to 2004 and was responsible for nominating the gas and managing the department.  After Shultz verified the invoices, she sent them to Lenore Kamien, Multiut's bookkeeper, who would book the payment. Kamien was "a perfectionist" and knew the exact amounts owed to Dynegy. (DF 15.)  Draiman also confirmed that the invoices initialed by

[2]D Ex. and M Ex. refer respectively to Dynegy's and Multiut's exhibits. DF refers to Dynegy's statement of material facts, and MF refers to Multiut's statement of additional facts.

Schultz were accurate with respect to the volume of gas nominated and delivered and the prices agreed to by Multiut as set forth on the invoices. (DF 23.)

At some point, Multiut fell behind on its payments. A meeting was held on March 7, 2001, to determine Multiut's outstanding balance. (DF 18.) Mark Ludwig and Ginger Wright attended on behalf of Dynegy, and Draiman and Kamien represented Multiut. (DF 18, 69.) At the meeting, Wright and Kamien reviewed Dynegy's internal accounting records, Dynegy's invoices, and Multiut's internal accounting records and correspondence. Kamien agreed that, as of December 2000, Multiut owed Dynegy at least $1,620,178. (DF 19, 71.)

Turning to present dispute, Dynegy explains that it hired an expert to calculate the amounts Multiut currently owes under the 1994 agreement. Dynegy's expert began his calculation with the $1,620,178 figure from above and (i) added in the amount of unpaid invoices, using only invoices that had been initialed by Schultz or her predecessor at Multiut, and (ii) subtracted the total payments made by Multiut since 2001, a figure based on cancelled checks produced by Multiut and Dynegy's accounting records. (DF 21, 25.) Multiut did not depose Dynegy's expert, nor submit a report of its own expert to challenge the calcuations of these amounts. In sum, Dynegy's expert concluded that Multiut owes $13,693,943.18 in principal and $1,654,301.54 in interest as of October 1, 2004.

## DISCUSSION

Based on the documents submitted by the parties, we find that no dispute exists that Multiut nominated and Dynegy then delivered the natural gas in the amounts and prices set forth on the invoices and other supporting documents, all as summarized by Dynegy's expert. As Multiut agrees, no dispute exists about the arithmetic. The unpaid invoices and interest add up

to $15,348,244.72, plus interest accruing from October 1, 2004. There is likewise no dispute that the parties agreed at the time to the particular prices set forth on those invoices.[3]

In its counterclaims and related affirmative defenses, Multiut argues for the first time that the various amounts and prices it agreed to years before were inflated. It claims that it was unaware of this fact because it believed it could "trust" Dynegy. (Resp. at 3.) Multiut also asserts two counterclaims specifically relating to Nicor Energy, a subsidiary Dynegy formed that competed with Multiut. One counterclaim alleges that Dynegy employees learned confidential information from Multiut when the parties had discussions in 1998 about the possibility of Dynegy buying Multiut. The other is a Robinson-Patman Act claim alleging that Dynegy sold gas to Nicor on more favorable terms. Finally, looming over all the counterclaims is a broad allegation that Dynegy's invoices should be reduced to reflect its alleged participation in manipulating the price of the natural gas indexes that were used, in some cases, to set the prices for sales to Multiut.

## I.     Breach of Contract Counterclaims.

Four of the six counterclaims allege that the parties entered into binding oral agreements.[4] To be enforceable, oral agreements must at least include an offer and acceptance, consideration, and definite and certain terms. *Association Benefit Services, Inc. v. Caremark Rx, Inc.*, 493 F.3d 841, 849-850 (7th Cir. 2007) ("No contract exists under Illinois law, and, indeed, under principles of general law, if the agreement lacks definite and certain terms; nor is a

---

[3]The parties agree that, if Multiut is liable under the breach of contract claim in Count I, then both Multiut and Draiman are also liable under the guaranty claim in Count II.

[4]Because the parties evaluate these claims under Illinois law, we will do the same.

contract formed by an offer that itself lacks definite and certain material terms and does not require such terms to be supplied by acceptance."). The requirement that the contract contain "definite and certain terms" means that, even if the parties intended to enter into an agreement, no contract exists if the court cannot figure out what are the essential terms. *Id.* at 850.

Although we address each counterclaim individually below, we note that they generally suffer from two primary problems. First, Multiut relies almost exclusively on its own unilateral "understanding" of vague conversations that took place many years ago, understandings that were never put in writing and that were never explicitly acknowledged by Dynegy. Second, for all but one of these counterclaims, Multiut has provided no evidence -- either documents or an expert witness -- to establish damages.

### A. Agreement To Lock In Prices – Counterclaim I.

Multiut's first counterclaim alleges that the parties orally agreed to "lock in" prices for certain Multiut's customers that were buying from Multiut on a fixed-price basis. The agreement was allegedly entered into orally at a meeting on September 17, 2001.

Dynegy admits that the parties discussed this issue but argues that they never reached any agreement. Dynegy secondly argues that, even if they did, such an agreement would be barred by statute of frauds. Finally, Dynegy argues that Multiut has not presented evidence of damages. Based on the first and third arguments, we find in Dynegy's favor on this counterclaim.

To support its allegation that the parties entered into this alleged agreement, Multiut relies on three facts from its statement of material facts:

> **Fact 66:** On or about September 17, 2001, Multiut supplied Dynegy with a list of contracts with end users for which Multiut had agreed to provide gas at fixed prices.

**Fact 68:** During the meeting with Multiut, Mark Ludwig and Pete Pavluk informed Draiman that they would work on locking in a price for gas below the fixed price at which Multiut agreed to supply gas for the duration of Multiut's fixed price contracts. Draiman testified that Pete Pavluk informed him along the lines that "he would get it done" or "it would be done."

**Fact 69:** Multiut relied on this understanding and did not seek out other suppliers for these fixed customers. By the time that Dynegy subsequently decided that it would not supply the gas at those fixed prices the market price for gas had risen to a point where [] Multiut paid more for gas than it received from its fixed price customers.

The evidentiary support for these three facts is the September 17th letter and Draiman's recollection of what was said at the meeting.

This evidence, even taken in a light favorable to Dynegy, fails to show that the parties intended to enter into a binding contract or show what the terms of such an agreement were. Draiman's testimony, as set forth in Fact 68, is that he was told that Dynegy would "work on" locking in prices. This statement is far too equivocal by itself to establish a meeting of minds, as it is ambiguous about whether Dynegy was merely considering the issue or alternatively making a vague but non-binding aspirational statement or, as Multiut alleges, was intending to enter into a binding contract. The rest of Draiman's testimony is similarly vague about exactly what was said in this conversation. When asked whether either Pavluk or Ludwig ever "explicitly" stated that Dynegy would agree to lock in prices, Draiman conceded that they never made any explicit statement. (M Ex. Q at 303.) Instead, Draiman fell back on his claim that it was his "understanding" that the parties had reached an agreement. But a party's subjective belief is not enough. *Ocean Atlantic Dev. Corp. v. Aurora Christian Schools, Inc.*, 322 F.3d 983, 995 (7th Cir. 2002).

The second piece of evidence, the September 17th letter, is also inconclusive and raises more questions than it answers. To begin with, the timing of the letter is unclear. The September 17th letter states in the first sentence that it was being sent "following" the meeting. (M Ex. DD.) In other words, contrary to the impression created by the order of the three facts quoted above, the September 17th letter was not presented *before* the meeting as a type of offer, but was sent *after* the meeting. Yet, the letter does not acknowledge that the parties had just reached an agreement. The letter merely provides a list of Multiut's fixed-price customers for Dynegy's "review," a word suggesting that the parties were only at a preliminary discussion stage. This interpretation is underscored by the fact that, a few months after receiving the September 17th letter, Dynegy told Draiman that it would *not* agree to lock in prices. (Draiman Aff. ¶ 25.) Draiman claims that Dynegy's rejection was "contrary to what [Draiman] had earlier understood," but his unsubstantiated belief is not a basis for concluding that the parties had entered into a binding agreement, especially when all of the available evidence suggests that the parties were only involved, at most, in negotiations.[5]

We also find that summary judgment is warranted for the separate and independent reason that Multiut has not provided any evidence of damages. The parties agree that Multiut must come forward with at least some evidence on summary judgment to show that it would be able to prove damages with a "reasonable degree of certainty" without relying on "conjecture or speculation." *See generally Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 428 F.Supp.2d 761, 767 (N.D.

---

[5]Even if the parties intended to enter into an agreement, the terms of the agreement are not clear. For example, how long would the agreement last? Draiman states in his affidavit (¶ 18) that it would have been for a "particular time period," but so far as we can tell, he never stated what that period would be.

Ill. Dec. 28, 2005) (summarizing cases) ("a non-movant's failure to produce sufficient evidence of the damages element of its claim calls for the entry of summary judgement against that party"). As Judge Shadur concluded in *Dunkin' Donuts*, a vague answer with no coherent explanation "totally flunks the Rule 56(e) requirement of *admissible* evidence." *Id.* at 770 (emphasis in original.)

Here, Multiut has not provided a way to calculate damages. During discovery, Multiut failed to comply with Rule 26's requirement that it provide a computation of damages. *See* D. Reply at 14-19 (summarizing discovery history). Multiut also has not provided an expert opinion on the damages related to its first counterclaim nor to any of the other counterclaims except the sixth one. Instead, Multiut relies solely on an affidavit of Draiman that was submitted after discovery closed. Dynegy argues that this affidavit should not be considered because Multiut failed to make timely disclosures during discovery. We agree. Multiut has not provided any explanation for its failure to make earlier disclosures, and to allow it to make late disclosures now, after a lengthy discovery process, would prejudice Dynegy. In sum, Multiut has not met its burden with regard to damages on this counterclaim.

### B.    Oral Agreement To Sell at Lowest Prices – Counterclaim VI.

The sixth counterclaim also involves an alleged oral agreement. The substance of the agreement, according to Multiut, is the following promise:

> Multiut would be charged (i) a price either equal to or 1/2 cent per therm higher than the index price, or (ii) the lowest price contemporaneously being charged by Dynegy to any of Multiut's competitors.

(Resp. at 36.) The latter provision is referred to by the parties as a "most favored nation" provision. Again, it is undisputed that there is no written document of any kind evidencing this agreement.

Dynegy makes similar arguments against this claim, asserting that it is barred by the statute of frauds; that no evidence proves that an agreement was reached; and that any agreement would have been superseded by the subsequent specific agreements on price. As explained below, we agree with these arguments.

The details of this alleged agreement are hazy. It is hard to reconstruct when it was made. The alleged agreement appears to be a hybrid of two oral agreements made many years apart.[6] The second half of the agreement -- the most favored nation ("MFN") provision -- is an "understanding" that supposedly existed since "the inception of [the parties'] relationship." (MF 54.) This would mean that the understanding came about sometime around 1988. Multiut provides no information about what day or month the parties agreed to this provision, where they were, who was present, or what was said. The first half of the agreement -- tying the price to a certain amount above the index -- was allegedly entered into "in the mid-1990s." (Resp. at 13; MF 56.) Again, few details are provided. Multiut cannot narrow the date the agreement was made down to even a specific year. Further uncertainty exists over how the two separate agreements are supposed to work together as they each set forth a different pricing structure, raising a question about which one takes precedence over the over in the event of a conflict.

---

[6]As Multiut artfully puts it in its brief (at p. 13), the parties entered into a "series of understandings" that in turn transformed into an "evolving" agreement.

Unlike the September 17th alleged agreements, these two oral agreements are broad and cover *all* nominations.  As such, it would be reasonable to expect that the parties would have included them in their written agreements given that they purported to set forth the general terms applicable to all nominations. The MFN provision allegedly was created before the 1988 and 1994 written agreements were signed.  Yet neither agreement includes the provision. The 1994 agreement is based on the assumption that all prices would be negotiated on an individual, case-by-case basis for each nomination, an assumption at odds with the existence of the MFN provision. Draiman now claims that Dynegy's agreement to the MFN provision was a "critical" pre-condition for Multiut entering into the 1988 written agreement.  *See* Draiman Aff ¶ 16.  If so, then surely he would have insisted that this critical provision be included in that agreement.  The only reasonable explanation for why it was not is that Dynegy never agreed to it. This conclusion is also supported by Shkop's testimony.  He said that Dynegy did not agree to include the MFN provision in the written agreements because of problems with other suppliers and with its parent company.  (M Ex. L at 20.)  For all the above reasons, the evidence fails to provide any basis for believing that Dynegy intended to enter into a binding agreement as alleged by Multiut.

### C.  Implied Agreement To Waive Interest Payments -- Counterclaim III.

The third counterclaim relates to the payment of interest for a certain period. Specifically, Dynegy failed to charge for interest in the invoices between March 1999 and December 2000 because, Dynegy explains, of an oversight that occurred with a change in employees. Multiut argues that the failure to send out invoices for this period constituted an implied agreement (or waiver) not to collect these interest payments. (MF 80.) In response,

Dynegy argues first that the mere failure to send out an invoice is not an agreement to forego collection of these amounts and secondly that Multiut has failed to provide evidence of damages.

We agree with Dynegy's first argument. Regardless of which legal theory it is relying on, Multiut acknowledges that it must show that it relied to its detriment on the implicit agreement or waiver. Yet, as Dynegy has demonstrated (*see* DF 66), the decisionmakers at Multiut had no knowledge of any agreement by Dynegy to waive charges. Most notably, Draiman was not involved in the making of any such agreement and did not know anyone who was. Although Lenore Kamien did notice that Dynegy had omitted the charges on some invoices, she only testified that she "assumed" that no interest was due. (MF 81.) And there is no evidence that she communicated with Draiman on this point.[7]

As for damages, although Multiut has not presented any evidence of damages, its failure with regard to this counterclaim is not fatal because the amount of interest charges has already been established by Dynegy first. Therefore, there would be no need for Multiut to provide proof of these amounts.

**D.      Agreement To Exclude Uncollectible Accounts -- Counterclaim IV.**

In its fourth counterclaim, Multiut alleges that the parties intended in their 1994 agreement that Multiut would not have to pay for uncollectible accounts from end users because Multiut was merely acting as an agent. In other words, Dynegy bore the risk of uncollectible accounts. In response, Dynegy acknowledges that the 1994 agreement includes two general

---

[7]The reconciliation provision in the 1994 agreement provided that the parties would have up to 24 months to rectify any mistakes in the billing process. *See* Ex. DD, Article V-A(2) The existence of this provision would make it even more unreasonable to rely solely on an unverified belief that charges were being waived.

provisions stating that Multiut was acting as an agent to the end user principals, but Dynegy argues that this language was included merely to help Multiut avoid sales tax obligations that it thought were due if it took title to the gas before selling it to its customers.  (DF 2.)  The parties agree that question of interpreting the meaning of the 1994 agreement is a legal question.

As both sides concede, the 1994 agreement contains no provision explicitly addressing the specific question of which party is responsible for uncollectible accounts of end users. Multiut relies on general language in the first paragraph of the 1994 agreement stating that Multiut is acting as an agent of the ultimate consumers of the natural gas and that Multiut is performing according to instructions from the end-user principals.  (MF 34-35.)  Dynegy in turn relies on several provisions in the body agreement.

We start with the general language relied upon by Multiut and do so by quoting the entire first paragraph of the agreement from which that language is taken:

> The purpose of this document is to set forth the understanding and Agreement between [Dynegy] and [Multiut], acting in its role as the duly authorized agent and representative of ultimate consumers and users of the natural gas delivered to Multiut under this Agreement. Seller and Multiut acknowledge that Multiut is acting as an authorized agent and is performing under this Agreement in accordance with the instructions of its principals. Except as specifically provided in this Agreement, Multiut and its principals, as ultimate consumers and users of the gas, are referred to collectively as "Buyer." Seller agrees to sell and deliver gas to Buyer pursuant to the following terms and conditions[.]

While this paragraph does contain two statements that Multiut is acting as an agent to certain end users, this language is general and not connected to any operative provision in the main part of the agreement.

Significantly, this first paragraph defines the term "buyer" as being *both* Multiut *and* the end users.  This collective definition by itself contradicts Multiut's argument that it was *not* a

buyer.[8]  Furthermore, when this definition of buyer is applied to paragraph 5, which states that

the "Buyer shall be obligated to pay for all quantities nominated," it can only be interpreted to

mean that Multiut, as a buyer, must pay for "all" the gas nominated. The agreement contains no

other language that excludes uncollectible accounts from this broad provision.

This conclusion is reinforced by other language in the agreement.  The agreement states

that Multiut is "responsible for collecting payment from its principals." (Ex. DD; Article V-

A(2).)  Reading this provision in a straightforward way, we find that it creates a strong

presumption that Multiut is "responsible for" uncollectible accounts.  Put differently, if the

parties had a contrary understanding, you would expect that they would have mentioned that

here to make clear that Multiut was only required to *try to* collect payments and was not

responsible if its effort failed.[9]  This presumption is also reasonable because the agreement

elsewhere specifically states that Dynegy is responsible for certain things.  For example, Article

IV-A states that Dynegy must pay "all royalties, taxes and other sums due on production[.]"  (Ex.

DD, Article IV-A.)

There is no contextual evidence to the contrary.  Multiut argues in its response brief (at

p.25) that the "circumstances surrounding the negotiation and performance" of the parties'

agreement created an "understanding" that Multiut would not be responsible for non-paying

---

[8]The term "Buyer" is used throughout the agreement in a way that would only make sense if Multiut were considered a buyer. The agreement states, for example, that the Buyer shall have a right to make daily nominations of gas. This could only refer to Multiut as no evidence suggest that end users nominated gas or interacted with Dynegy in any way.

[9]Multiut's interpretation would create an awkward incentive system and also one difficult to enforce. How would a court be able to determine if Multiut was in breach of its duty to"collect" payments?

customers.  But it has no evidence that Dynegy agreed to this understanding.[10]  Draiman testified

that no one from Dynegy ever said that Multiut would not be responsible if customers did not

pay.  (DF 76.)

As for Dynegy's alternative argument that Multiut did not produce evidence of its

damages, Multiut states that the uncollectible accounts were $2,761,735.45.  (MF 129.)  This

amount comes from Draiman's affidavit (¶ 29). However, as noted above, Multiut failed to

disclose this information in discovery and may not rely on it now.

**II.      Counterclaims Relating to Nicor.**

**A.      Breach of Confidentiality Agreement -- Counterclaim II.**

In 1997, Dynegy expressed an interest in purchasing Multiut, and the parties entered into

a confidentiality agreement to allow Dynegy to investigate the possibility.  (1st Am CC ¶¶ 16-

22.)  As part of this process, several Dynegy employees were given confidential and proprietary

information, including customer lists, copies of contracts with customers, etc. Dynegy, after

receiving and studying the Multiut information, ultimately purchased Nicor and Illinova, two

competitors of Multiut. Multiut alleges that the Dynegy employees "inevitably disclosed"

confidential information to Nicor and Illinova and that, as a result, those companies were able to

win customers from Multiut.

Dynegy raises a number of arguments in response, arguing that no evidence exists that

the employees received confidential information and arguing that the "inevitable disclosure"

---

[10]In his deposition, Draiman stated that it was his understanding that the parties would
"share" the burden of uncollectible accounts. (MF ¶ 49.) This statement is in conflict with
Multiut's current position that Dynegy would be solely responsible and it also raises a question
of exactly how they would share the burden.

doctrine only applies if an employee of Multiut was hired by Dynegy. Dynegy also argues that Multiut has no evidence of damages.

We find that summary judgment is warranted on the latter ground. Although Multiut alleges that it lost "profits and other damages" of more than $5 million from the alleged breach of the confidentiality agreement, Multiut has provided no evidence to quantify damages. Multiut's expert stated in his deposition that he did not do any work to calculate damages relating to this counterclaim. (DF 65.) We have already found that Draiman's affidavit may not be considered. And Draiman admitted that he does not know the number of customers that allegedly left Multiut for Nicor while also admitting that the loss of business was attributable to, among other things, his brother's involvement, service issues, customer relationship issues, and the size of the customer. *See* DF 92-93.

### B.      Alleged Violation of Robinson-Patman Act – Counterclaim V.

Asserting a claim under the Robinson-Patman Act, 15 U.S.C. § 13(a), Multiut alleges that Dynegy sold gas at lower prices to competitors of Multiut, one of which was Nicor. Dynegy moves for summary judgment on three grounds: (i) Multiut cannot show that the gas sold to Nicor and Multiut was of "like grade and quality"; (ii) Multiut failed to provide a computation of its alleged injury; and (iii) Multiut failed to show that it had standing to assert an RPA claim.

As to the first argument, Dynegy argues that what was being sold was not merely the natural commodity of natural gas but also inextricably included related services that varied between Multiut and Nicor, making them different cases. Multiut responds that this argument is really an affirmative defense of cost justification and that this is a fact question. Because we are

not convinced by the authorities submitted by Dynegy on this argument, we find that summary judgment is not warranted on this ground.

We are also not persuaded by the third argument that Multiut is precluded from asserting an RPA claim because it was only an agent. As noted above, Dynegy has already argued that Multiut was not merely an agent but was operating more as a buyer in its own right. We have agreed with that argument based on our interpretation of the language of the contract. As Dynegy itself has argued in its reply brief, "Multiut is one or the other, not both." (Reply at 35.)

However, as to the second argument, we agree that Multiut has failed to show evidence of injury. As described in Dynegy's opening brief, the Supreme Court has held that a private plaintif seeking damages must not only meet the essential elements of a § 2(a) claim but also must show that it suffered injury. *See* Mem. at 31 (citing *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981) ("proof of a violation does not mean that a disfavored purchaser has been actually 'injured' within the mean of § 4"). Dynegy points out that Multiut has provided no evidence of injury. In its one-paragraph response, Multiut only makes a conclusory assertion that it lost sales and profits. *See* Resp. at 49. But it has no evidence. First, Multiut specifically told its expert not to do any work on, or provide any opinions with respect to, the Robinson-Patman Act claim. Second, as noted above, although Draiman claims in an affidavit that his company lost customers to Nicor, he did not know of a single customer who had left Multiut for Nicor, and he also admitted that Multiut lost customers because of unrelated issues. (DF 92-94.)

**III.    Index Manipulation Evidence.**

Multiut spends much time in its response arguing that Dynegy manipulated the index prices. *See* Resp. at 16-24. This allegation is based largely on an investigation conducted by the Federal Energy Regulatory Commission ("FERC") in 2002 and 2003.  FERC concluded in a lengthy report that a number of major energy companies reported false price and volume information to industry publications, such as *Gas Daily* and *Inside FERC*, that compiled price indexes. (M Ex. A.)  Fifteen Dynegy traders were involved in some way, including one who was later convicted for activity relating to price manipulation. As a result of its conduct, Dynegy entered into a settlement with FERC valued at approximately $282 million. (MF 14.) Multiut argues that Dynegy's involvement either precludes recovery altogether or that it requires that the total amount be reduced by "invoices tainted by that manipulation." (Resp. at 16.)

The legal theory underlying this allegation is not clear.  At one point, Multiut suggests that Dynegy must show as part of its *prima facie* breach of contract case that the invoices were *not* tainted by manipulation. *See* Resp. at 21. But we cannot find any legal support for the assertion that Dynegy must disprove fraud as part of its initial case.  Multiut also argues that the price manipulation allegation relates to its first affirmative defense.  (Resp. at 22.)  This defense, entitled "Material Breach," alleges that Dynegy "overcharged for gas . . . by failing to properly apply the index price [and] by failing to charge Multiut . . . the lowest price contemporaneously being charged  . . . to Multiut's competitors." (Docket # 81, ¶ 10.)  This affirmative defense is thus a restatement of the sixth counterclaim. Yet, as explained above, we have already granted summary judgment on that counterclaim, finding that the parties did not have any general

agreement to base prices on index prices. We are therefore unclear at the outset as to how the price manipulations allegations fit into any viable legal theory.

In its reply brief Dynegy offers five specific reasons why the manipulation allegations should not be considered: (1) they are barred by *res judicata* based on Judge Pro's dismissal of similar claims in the multi-district litigation in Nevada; (2) Magistrate Judge Mason already determined that evidence concerning price manipulation is not admissible or even likely to lead to admissible evidence; (3) the alleged manipulation only concerned California and western markets, but not price manipulation of the Chicago city-gate indexes that were used as the indexes by these parties; (4) the doctrine of unclean hands is not an affirmative defense to Dynegy's monetary claims; and (5) Multiut did not plead (and therefore waived) these affirmative defenses. As explained below, we find that summary judgment should be granted on the first and third arguments.

Before addressing these two arguments, we begin with a general observation. The manipulation allegations are vast. They cover a wide and complex group of participants and a broad and factually intense subject area. The FERC report is over 400 pages and was completed after a year-long investigation. It discusses the activities of many wholesalers, including Aquila, AEP, El Paso Merchant Energy, Williams, Reliant, Duke, Mirant, Coral, CMS, and Sempra Energy Trading. (M Ex. A at ES-7-8.) It focuses on both the electricity and natural gas markets and concludes that they were "inextricably linked." (M Ex. A at ES-1.) Multiut's theory is that all these companies together defrauded the entire marketplace. (Resp. at 21.) In short, if these allegations are added to this case, they would turn a relatively straightforward breach of contract case involving two parties into a sprawling nationwide fraud case implicating numerous parties.

As for Dynegy's argument that these claims are barred by *res judicata*, we agree with the reasons and authorities offered by Dynegy.  *See* Reply at 4-7.  As summarized therein, Judge Pro ruled that Multiut's claims for fraud, violations of the Illinois Deceptive Business Practices Act, and violations of the Sherman Act, all of which were based on the same facts as the manipulation allegation here, should be dismissed under the filed rate.  *See* Reply, Ex. 6 – *In Re Western States Wholesale Natural Gas Antitrust Litig*, MDL 1566, Order dated May 15, 2006.  In granting Dynegy's motion to dismiss, Judge Pro held that the "nature of the damages sought would require this Court to determine the just and reasonable price of natural gas absent the alleged misconduct which forms the basis of Plaintiff's Complaint, and therefore would be a violation of the filed rate doctrine." (Order at 12.)  As Dynegy has demonstrated, there is an identity of the parties; an identity of the causes of actions as the manipulation allegations here are the same as in the Nevada case; and there is a final judgment on the merits. Multiut's complaint in the Nevada action contains the same allegations asserted here. *See* Dynegy Reply Ex. 5.  If Multiut were allowed to litigate its manipulation claims here, it would defeat the purposes of *res judicata*.

We also agree with Dynegy's argument that the FERC report relates to the manipulation of the California and western market indexes.  Index prices existed for 11 distinct geographic areas of the United States and Canada and also for 100 separate delivery points within those geographic areas. *See* Dynegy Reply at 9.  The sales at issue here related only to the "Chicago City Gate" index prices.  And, as Dynegy has argued in its reply brief, none of the investigations described in the FERC report and other exhibits submitted by Multiut address a single instance of a false price or volume report by a Dynegy employee with respect to Chicago city gate price

indexes.  Accordingly, we find that the alleged manipulation is too remote to be connected to a specific sale between these two parties.

This argument points to a larger problem with the manipulation allegations. The causal chain that Multiut seeks to prove is too attenuated and diffuse. Although not dispositive by itself, Magistrate Judge Mason's observation in discovery is nonetheless apt:  "[t]he relevance of [the price manipulation evidence] is premised on the implausible assertion that Dynegy, one of the many participants in the natural gas market, could independently influence the index price." (12/02/03 Order.) As this observation suggests, Dynegy was only one of many players in this market and could not control the entire market by itself. Moreover, it is not clear how damages would apply in that Multiut's theory is that the fraud was perpetrated on the entire marketplace so that the price charged by all suppliers presumably would have been equally affected by the alleged manipulation. And it is also not clear in Multiut's response brief whether the higher charges were simply passed through to end users. As Draiman stated in his affidavit, some customers were charged on either a "cost plus" or an "index plus" method in which the end user paid the index price plus an additional charge to Multiut. These questions, and many others, are not explained clearly in Multiut's response brief. In sum, for all the above reasons, the price manipulation allegations, even if true, do not preclude summary judgment on either Dynegy's claims or Multiut's counterclaims.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted, and judgment is granted to plaintiff, and against defendants Multiut and Draiman, on Counts I and II of plaintiff's amended complaint, in the amount of $15,348,244.72 plus interest accruing from October 1, 2004. Judgment is granted for plaintiff and against defendants on Counts I through VI of defendants' counterclaims.

**ENTER:**

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**


**DATED: June 11, 2008**